UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

DEBBIE MARZI MENDENHALL )
)
V. ) NO. 2:11-CV-308
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation following the administrative denial of her application for supplemental security income under the Social Security Act following a hearing before an Administrative Law Judge. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 10 and 16].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 45 years of age at the time of her hearing. She has a 6th grade or "limited education" which included special education classes (Tr. 166-77). Plaintiff has past relevant work experience as a certified nurse's assistant and housekeeper (Tr. 35-36). Plaintiff is 5 feet 1 inches tall, with a weight of 365 pounds at the administrative hearing (Tr. 26).

The medical record is fairly straightforward, and is summarized in the plaintiff's memorandum as follows:

> Plaintiff underwent MRI of the cervical spine on July 12, 2007, due to neck and left arm pain. At C3-C4 there was a small central disc protrusion causing effacement of the thecal sac in this region and an impression on the spinal cord; at C4-C5 there was a central disc protrusion, more broad based and causing effacement of the thecal sac and minimal impression on the spinal cord; at C5-C6 there was a large left paracentral disc protrusion causing marked mass effect on the spinal cord from the left side and complete obliteration of the anterior CSF space in this region, with mild spinal canal narrowing seen on the left side; and at C6-C7 minimal disc bulge was seen (Tr. 202-203).
> On August 3, 2007, Plaintiff presented to Dr. Larry Hartman with a one year history of progressive neck pain associated with numbness and tingling in both upper extremities. Plaintiff was also noted to have a relatively long standing history of low back pain with pain extending into both lower extremities. Exam was remarkable for morbid obesity; neck tenderness with a markedly diminished range of motion; diminished range of motion of the lumbar spine with some tenderness in the lumbar paraspinous muscles; diminished left biceps reflex as compared to the right; weakness of the left biceps muscle as compared to the right; and possible limitation of the deltoid muscle. MRI of the cervical spine was reviewed and noted to show degenerative disc disease at C3-4 and even more impressive at C5-6, as well as what appeared to be a very substantial extradural defect on the left side at C5-6, very significantly compromising the neuroforamen. Dr. Hartman's impression was very impressive disc herniation, slightly eccentric towards the left, which appears to reasonably well account for neurological exam. Dr. Hartman opined the source of Plaintiff's back pain is primarily myofascial and related in large measure to her profound exogenous obesity. C5-6 anterior cervical discectomy was recommended (Tr. 249-252).
> Plaintiff was admitted to Holston Valley Medical Center from August 23, 2007

2

through August 24, 2007, when she underwent C5-6 anterior cervical discectomy and homologous bone graft fusion with Synthes plate and screw internal fixation by Dr. Hartman. The discharge diagnosis was left C6 radiculopathy secondary to disc extrusion at C5-6 (Tr. 211-220).

On October 15, 2007, x-rays of Plaintiff's cervical spine showed previous discectomy and disc space fusion at the C5-C6 disc level (Tr. 201). On October 26, 2007, cervical spine x-rays showed anterior fusion of C5 and C6 as well as spondylosis at C3-4 (Tr. 221-222).

Plaintiff has received Emergency Room treatment at Indian Path Medical Center. Plaintiff was seen four times from November 23, 2007 through September 19, 2008, due to shingles, upper respiratory infections, urinary tract infection, headache, and sinusitis (Tr. 187-200). On February 8, 2009, Plaintiff presented with complaints of neck and left shoulder pain. Cervical spine x-rays showed previous surgical disc space fusion at C5-C6 and mild degenerative disc disease at C3-C4 (Tr. 183-186). Plaintiff returned on March 23, 2009, with complaints of neck pain, left shoulder pain, and left arm pain associated with weakness and numbness. The diagnosis was trapezius muscle spasm (Tr. 179-182).

Plaintiff received Emergency Room treatment at Holston Valley Medical Center on March 20, 2009 and March 28, 2009, due to complaints of left shoulder pain and neck pain (Tr. 228-231).

Plaintiff resumed treatment by Dr. Hartman from April 8, 2009 through May 27, 2009, during which time she was suffering neck pain radiating down the left arm with numbness and tingling extending down the left arm to the fingers. Plaintiff remained morbidly obese, weighing 375 pounds at 61 inches tall and having gained 50 pounds since her previous surgery. On April 8, 2009, MRI of the cervical spine was somewhat limited by Plaintiff's large body habitus, but noted possible disc herniation at two levels, more suspicious at C4-5 than at C3-C4 (Tr. 247-248). On May 13, 2009, CT study of the cervical spine yielded the impression of status post C5-6 ACDF with complete osseous fusion at this level, mild C4-5 disc bulging, and posterior osteophyte at C5-6 (Tr. 241-242).

Plaintiff received treatment at Rural Health Service Consortium from June 14, 2007 through September 10, 2009. Conditions and complaints addressed include fatigue, allergic rhinitis, cystitis, morbid obesity, left upper extremity pain and numbness, neck pain, low back pain radiating into the left leg, anemia, upper respiratory infection, hypertension, urinary tract infection, visual disturbance, abdominal pain, left shoulder pain, arthritis, and enlarged thyroid (Tr. 254-288). On July 30, 2007, MRI of the lumbar spine was limited due to Plaintiff's body habitus, but noted degenerative disc disease, central disc protrusions at L4-5 and L5-S1, and possible left lateral disc protrusion at L4-5 (Tr. 270-271). On September 8, 2008, abdominal ultrasound yielded the impression of mild increased echogenicity involving the liver felt to be secondary to fatty infiltration, slightly dilated extrahepatic bile duct likely related to post cholecystectomy status, and mild splenomegaly (Tr. 261-262). On September 10, 2009, thyroid ultrasound showed mild enlargement of the thyroid gland with several tiny cysts (Tr. 256).

Plaintiff received treatment at Pain Center of Kingsport from September 10, 2009 through March 1, 2010, due to cervical pain, thoracic pain, lumbar pain, and neck spasms. Sensory conduction study noted findings suggesting pathology of left C2 greater occipital nerve, +1 mild; left C5 axillary nerve, +2 moderate; and left C6 radial nerve

lateral branch, +1 mild. Suspected findings included right C4 suprascapular nerve, -1 hyper; right C5 axillary nerve, -1 hyper; and right T2 second thoracic nerve, -1 hyper (Tr. 289-305).

On March 16, 2010, Plaintiff underwent consultative exam by Steven Lawhon, Psy.D. Plaintiff recalled two presidents but did not complete serial sevens; she did not recall common proverbs; she recalled two out of three objects, suggesting mild impairment in her short-term memory; and she was noted to have quit school in the sixth grade. WAIS-III testing yielded a Verbal IQ score of 70, a Performance IQ score of 81, and a Full Scale IQ score of 79. WRAT testing revealed 5.8 grade Word Reading level, a 7.1 grade Sentence Comprehension level, a 5.5 grade Spelling level, and a 4.3 grade Math Computation level. The diagnoses were depression due to medical reasons and borderline intellectual functioning, with a current global assessment of functioning of 58. Dr. Lawhon opined Plaintiff's ability to understand and remember is not significantly limited; her ability to sustain concentration and persistence is moderately limited; her social interaction is not significantly limited; and her work adaptation is mildly to moderately limited (Tr. 306-310).

Plaintiff underwent consultative exam by Dr. Samuel D. Breeding on July 16, 2010. Presenting problems included neck pain associated with radicular symptoms of numbness in the hands and arms; arthritis pain in the shoulders, neck, and hands; high blood pressure; and being a slow learner, having completed the sixth in special education classes. Review of symptoms was positive for shortness of breath, frequent urination, and occasional asthma. On exam, Plaintiff was 61 inches tall and weighed 362 pounds; her gait was slow; and she had decreased range of motion in her cervical spine. The diagnoses were history of herniated cervical disc surgery with recurrent radicular symptoms, arthralgias, hypertension, and history of learning disability. Dr. Breeding opined Plaintiff can lift 20 pounds occasionally; can sit four to six hours in an eight-hour day; can stand for two to four hours in an eight-hour day; and would have difficulty doing activities that require repetitive neck movements (Tr. 329-332).

On April 20, 2010, a reviewing state agency psychologist opined Plaintiff is moderately limited in her ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and to respond appropriately to changes in the work setting. In summary, Dr. Hammonds opined Plaintiff demonstrates the ability to complete simple two-three step commands; she would be able to maintain attention and concentration for at least two hours at a time as required to perform simple tasks; she has the ability to interact appropriately on a consistent basis with others, but contact with others should be casual and supervision should be direct and non-confrontational; and she is able to adapt to routine changes and respond to directions from others, but changes in the environment should be gradually introduced (Tr. 311-328). On November 18, 2010, a second reviewing state agency psychologist affirmed this assessment as written (Tr. 347).

On August 6, 2010, a reviewing state agency physician opined Plaintiff can

4

lift/carry a maximum of 20 pounds occasionally, ten pounds frequently; can stand/walk for a total of at least two hours in an eight-hour workday; can sit for a total of about six hours in an eight-hour workday; can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and is limited to occasional overhead reaching bilaterally (Tr. 333-341). On November 23, 2010, a second reviewing state agency physician affirmed this assessment (Tr. 346).

Plaintiff continued treatment at Rural Health Service Consortium from July 27, 2010 through March 30, 2011, due to amenorrhea, hypertension, cervicalgia with spasms, chest wall pain, morbid obesity, GERD, iron deficiency anemia, enlarged thyroid, and back pain with muscle spasms (Tr. 348-354).

Plaintiff continued treatment at Pain Center of Kingsport from October 20, 2010 through April 25, 2011, during which time she was suffering neck pain, bilateral shoulder pain, bilateral hand pain, low back pain, radiculopathy, cervical bulge, cervical spondylosis, depression related to inability to work, degenerative disc disease of the lumbar spine, and facet arthropathy (Tr. 355-93).

[Doc. 11, Pgs. 2-7].

At the administrative hearing, counsel argued in his opening statement that the plaintiff met the requirements of Listing 12.05(C), the particulars of which will be thoroughly discussed further on in this report and recommendation. He also argued that the plaintiff would be disabled due to the fact that Dr. Breeding's total hours of sitting, standing and walking, at the low hourly range of his opinion, would be less than 8 hours. Of course, this would mean she could not work an 8 hour day. (Tr. 25).

Before being questioned, the vocational expert, Bentley Hankins, asked the plaintiff about her past relevant work. Plaintiff testified that her past relevant work as a certified nursing assistant required her to pass an examination (Tr. 35).

Mr. Hankins was then asked by the ALJ to assume a younger individual with the plaintiff's past relevant work experience. He was asked to assume that person was only capable of working with "light[1] exertion with standing and walking for no longer than four

---

[1]The Court assumes that the transcriptionist misunderstood the tape recording and that the ALJ actually said "light" rather than "slight" which is contained in the transcript. "Slight" of

hours total in an eight-hour workday...no climbing of ladders, ropes and scaffolds, but otherwise can perform occasional posturals, occasional climbing of ramps and stairs, occasional bouncing, stooping, kneeling, crouching and crawling. Reaching above the shoulder with both arms is limited to occasional. Furthermore, this person, this individual is limited to performing simple, repetitive nondetailed tasks where co-worker and public contact is casual and superficial, where supervision is direct and nonconfrontational, and where changes in the workplace are infrequent and gradually introduced." When asked if there were jobs such a person could perform, Mr. Hankins identified the jobs of hand packers and packagers, small parts assemblers, parking lot attendants, production inspectors, testers, sorters and samplers. He opined there were approximately 1.1 to 1.2 million such jobs in the nation and 28 to 30 thousand in the State of Tennessee (Tr. 36-37). If she could not work beyond the "lower limits" opined by Dr. Breeding, four hours of sitting and two hours of standing or walking, there would be no jobs she could perform (Tr. 37-38).

In his hearing decision, the ALJ found that the plaintiff had severe impairments of degenerative disc disease of the neck, obesity, depression, and borderline intellectual functioning (Tr. 11). He then found that the plaintiff did not meet or equal an listed impairment. He focused his discussion on this finding analyzing whether the plaintiff met or equaled the requirements of Listing 12. 04 relating to affective disorders, rather than 12. 05(C) which was argued by the plaintiff at the commencement of the administrative hearing.

---

course has no meaning in Social Security law in the context of lifting capacity, while "light" exertion refers to an ability to frequently lift and carry ten pounds and occasionally lift and carry 20 pounds. This assumption is based upon the vocational expert's answer and the fact the plaintiff does not suggest otherwise.

Listing 12.04 deals with the effects of manic or depressive conditions, while 12. 05 deals with "mental retardation." (Tr. 11-12).

The ALJ then set forth the residual functional capacity he found for the plaintiff, which does not differ in any substantial way from that presented to the VE at the hearing set forth above (Tr. 12). He then discussed the plaintiff's activities of daily living and the medical evidence. He gave "great weight to the opinion of Dr. Hartman as it is supported by the medical record." (Tr. 13). He discussed the findings of Dr. Breeding, the consultative examiner. The ALJ gave "some limited weight to Dr. Breeding's opinion as the claimant did return to work after surgery." With respect to the findings of Dr. Lawhon, the consultative psychological examiner, the ALJ pointed out that Dr. Lawhon found the plaintiff to be in the borderline range of intellectual functioning. He accorded Dr. Lawhon's assessment "significant weight." He also found the opinions of the state agency medical consultants were "persuasive" to the extent the were "consistent with the medical evidence of record." (Tr. 14).

Based upon the testimony of Mr. Hankins, the ALJ found that there were a substantial number of jobs which the plaintiff could perform. Accordingly, he found that she was not disabled (Tr. 15-16).

As plaintiff argued to the ALJ, he asserts that the plaintiff is disabled under two independent theories. He asserts that she meets the requirements of Listing 12.05(C), and that since the "low end" of hours in the range given by Dr. Breeding for sitting and standing/walking do not total 8 hours, the plaintiff can perform no jobs.

With respect to Dr. Breeding's assessment, plaintiff's specific argument is that the

7

ALJ did not adequately explain his analysis regarding the report of the consultative examiner, making it "impossible to determine whether the ALJ simply overlooked the limitations noted by Dr. Breeding or whether he discounted them."

The statements in the hearing decision by the ALJ regarding the opinion of Dr. Breeding are arguably somewhat ambiguous, but Dr. Breeding's opinion is not inconsistent with the ability to perform a reduced range of light work. Dr. Breeding's opinion left a considerable amount of wiggle room. Within Dr. Breeding's range, plaintiff could work for as much as ten hours in a day (6 sitting and 4 standing and walking), or as little as six (four sitting and 2 standing an walking). However, Dr. Breeding was not the only medical evidence in the record. Her treating physician, Dr. Hartman, noted findings indicative of a limited range of light work (Tr. 239-53). Also, the state agency physician supports the ALJ's RFC finding (Tr. 333-41). There is substantial evidence to support the ALJ's finding regarding the plaintiff's residual functional capacity, and any error in that regard is harmless.

Plaintiff's more compelling, and complicating, argument is that the plaintiff's RFC is of no consequence since, according to her, she should have been found to have met Listing 12.05(C) at Step Three of the five-step sequential analysis, making her RFC totally irrelevant. 20 C.F.R. § 920 (d) provides that "if you have an impairment(s) which meets the duration requirement and is listed in appendix 1..., we will find you disabled without considering your age, education, and work experience." The RFC is determined at Step Four, which only is reached if the Social Security claimant's severe impairment or combination of impairments does ***not*** meet or equal the criteria of a listed impairment.

Listing 12. 05(C) reads as follows:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.d., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity is met when...

C.      A valid, verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function [is found]

Thus, there are three requirements which must be met. First, a person must have mental retardation which is shown to have its onset before age 22 with significantly subaverage intellectual functioning with deficits in adaptive functioning. Second, a person must show a valid IQ, either verbal, performance or full scale, of 60 through 70. Finally, a person must have another severe impairment, either physical or mental.

Here, clearly, the plaintiff has a valid Verbal IQ score found by Dr. Lawhon of 70, which lies at the farthermost edge of meeting the requirement, but meets it nonetheless. Likewise, the plaintiff has other severe impairments found by the ALJ in the form of degenerative disc disease, obesity and depression. As to the first prong, mental retardation, plaintiff asserts she meets this by virtue of her sixth grade education, taking part in some special education classes, and extremely poor grades.

The Commissioner concedes the IQ score and other severe impairments. However, he asserts that "without a diagnosis of mental retardation, Plaintiff does not meet the listing." According to the Commissioner, "her contentions [regarding her special education classes, poor grades, and being a slow learner" do not substtitute for a diagnosis of mental retardation." [Doc. 17, pg. 9]. The Commissioner points to her many years of work as a certified nurse's assistant and housekeeper, her ability to read and write, and Dr. Lawhon's

9

diagnosis of borderline intellectual functioning to show she is not mentally retarded and did not have deficits in adaptive functioning before age 22 sufficient to satisfy the "diagnostic description for Listing 12.05..." *Id.*, pgs. 8-10.

Both the plaintiff and the Commissioner cite the case of *Foster v. Harris*, 279 F.3d 348 (6th Cir. 2001). In *Foster*, the Court affirmed the finding that the plaintiff in that case did not meet the requirements of 12.05(C), and stated that the mental retardation "diagnostic description" means that to meet the listing, a person must in fact be mentally retarded, as opposed to having borderline intelligence, as opined by Dr. Lawhon and found by the ALJ. This listing is not, however, a "formula" involving no fact-finding by the ALJ as to the diagnostic component. It must still be determined, particularly in the absence of a clear diagnosis of "mental retardation," whether a person had "deficits in adaptive functioning" for age 22. Like the present plaintiff, Ms. Foster had a limited education. But the Court took into account his work history as an accounting clerk at a bank and as a liquor store clerk in determining whether he had deficits in adaptive functioning, concluding he did not.

In any event, Dr. Lawhon did not diagnose mental retardation, but borderline intellectual functioning, and that is simply not the same as mental retardation, mild or otherwise. That alone would suffice to provide substantial evidence for the ALJ's finding. In addition to *Foster*, *see* also *West v. Commissioner of Soc. Sec.*, 240 Fed. Appx. 692, 2007 WL 1991059 (6th Cir. 2007). In addition, *West*, like *Foster, supra*, also took into account the plaintiff's work history in finding he did not meet the diagnostic component for mental retardation.

It would have been helpful to the Court if the ALJ had tackled the Listing 12.05(C)

question posed to him by plaintiff's counsel at the administrative hearing head on in his hearing decision.  However, the Court cannot ignore Sixth Circuit precedent and the substantial evidence that is in this record showing that the plaintiff suffered from no more than borderline intellectual functioning and not mental retardation.

Plaintiff's counsel has made an excellent argument in a very well written and interesting brief.  However, under the present state of the case law, the Court finds that there was substantial evidence to support the ALJ's findings that the plaintiff did not meet a listed impairment, that she had the RFC contained in the question to the VE, and that a substantial number of jobs exist which she can perform.  Accordingly, it is respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 10] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 16] be GRANTED.[2]


Respectfully submitted:


s/ Dennis H. Inman
United States Magistrate Judge

---

[2]Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived.  28 U.S.C. 636(b)(1).

11